**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

HY-KO PRODUCTS, INC.         CIVIL ACTION NO.
60 Meadow Lane
Northfield, Ohio 44067

       Plaintiff

       vs.

                                   JURY TRIAL DEMANDED

THE HILLMAN GROUP, INC.
c/o National Registered Agents, Inc.
145 Baker Street
Marion, Ohio 43302

       and

KABA ILCO CORPORATION
c/o Joseph Franklin Belflower
Kaba Ilco Corporation
400 Jeffreys Road
Rocky Mount, North Carolina 27804

       Defendants


## COMPLAINT

### NATURE OF THE ACTION

1.      Hy-Ko Products, Inc. ("Company") seeks treble damages and injunctive relief to redress injuries to competition in the markets for automatic key machine systems and replacement keys caused by The Hillman Group, Inc. ("Hillman") and Kaba Ilco Corp. ("Ilco"), each acting alone or in combination with the other.  As a result of a pattern and practice of continuing unlawful anticompetitive conduct intended to preserve their monopolies and exclude the Company from the markets, consumer prices for replacement keys have been artificially elevated, technological innovation for automatic key machines suppressed and consumer choices

among competing suppliers drastically curtailed.  Hillman's and Ilco's anticompetitive conduct has caused grave harm to the Company's business and property from obstruction of its access to markets, driving up its costs of doing business and choking off its revenue from product sales.

2.      Through a chain of mergers and acquisitions beginning in the 1960's, Hillman has achieved a monopoly in the U.S. market for automatic key machine systems and Ilco has gained a monopoly in the U.S. market for replacement keys.

3.      By means of illegal and exclusionary conduct, Hillman has maintained a monopoly in the market for specialized automatic key duplication machines used in large home center retail chains such as The Home Depot, Lowe's, Menard's and Orchard Supply Hardware ("Orchard") and mass merchant retail chains such as Wal-Mart, Sears, Kmart and Meijer (collectively, "Big Box retailers"), along with the supply of replacement keys for the machines. Hillman has thereby suppressed competition and impeded innovation in the market for automatic key machine systems.

4.      Prior to 2007, Hillman was the sole provider of automatic key duplication machines used in U.S. stores of Big Box retailers.  These are sophisticated electronic devices that aid in the identification of the key to be duplicated and, without any operator guidance, cut the key blank to duplicate the customer's original key.  They are in use in all Big Box stores because they reduce key duplication time and minimize the need to train employees in how to cut keys manually.  Through formal or de facto exclusive dealing arrangements, Hillman requires retailers to purchase key blanks to be cut on the machines solely from Hillman or a source approved by Hillman.

5.      The Company developed an automatic key duplication machine for this application over a period of years and introduced it to the market in 2007.  Wal-Mart was the

first retailer to install the Company's machine, and Wal-Mart replaced Hillman's machine with it in many of its Florida stores beginning in 2007.  In an effort to protect its monopoly, Hillman tried at the outset to stop Wal-Mart from using the Company's machine by telling Wal-Mart that its cutting mechanism infringed a Hillman patent, and Hillman has engaged in other exclusionary conduct, through the exercise of its monopoly power, to prevent further loss of Wal-Mart stores and to keep other retailers from displacing Hillman's machine with the Company's machine.

6.      Hillman has exerted its monopoly power to target the Company's sale of other product lines, including letters, numbers and signs ("LNS"), to independent hardware store cooperatives and wholesalers through the use of predatory bundled rebates and other anticompetitive means, for the purpose of driving up the Company's costs of doing business and cutting off its revenue from product sales.  In furtherance of its exclusionary goals, Hillman has also unlawfully coerced suppliers of "licensed" keys bearing famous trademarks and logos into refusing to deal with the Company.

7.      Ilco is the largest manufacturer of replacement key blanks in the world, and it supplies Hillman's requirements for replacement key blanks.  By means of illegal and exclusionary conduct, Ilco has maintained a monopoly in the market for replacement key blanks sold in the primary retail channels in the U.S. market, including sales to Hillman to supply Big Box retailers and large home center retail chains and sales to independent hardware retailers and their buying cooperatives such as True Value Hardware and Ace Hardware.  Since at least 2003 when the Company achieved its first significant competitive success against Ilco, Ilco has engaged in a pattern of continuous retaliatory anticompetitive conduct designed to exclude the Company from the market for replacement key blanks, and it has thereby suppressed

competition, stabilized prices, limited output and stifled innovation in the market for replacement key blanks.

8.     In addition to their unilateral actions, Hillman and Ilco have conspired and combined to restrain trade and retain their respective monopolies through allocation of markets and customers and joint exclusionary tactics, including, upon information and belief, coordination in bidding and other collusive conduct in situations where one or both are competing against the Company for the sale of replacement key blanks, and, as known presently by the Company, have thereby succeeded in excluding the Company, at a minimum, from the supply of replacement key blanks to the True Value Hardware buying cooperative.

## THE PARTIES

9.     The Company is a corporation organized and existing under the laws of the State of Ohio and has its principal place of business at 60 Meadow Lane, Northfield, Ohio 44067.

10.     Hillman is a Delaware corporation with its corporate offices at 10590 Hamilton Avenue, Cincinnati, Ohio 45231.

11.     Ilco is a North Carolina corporation with its corporate offices at 400 Jeffreys Road, Rocky Mount, North Carolina 27804.

## JURISDICTION AND VENUE

12.     This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337(a) because the Complaint asserts claims arising under an Act of Congress protecting trade and commerce against restraints and monopolies.  The Company brings this action under Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1, 2) and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15, 26).

13.     This Court has jurisdiction over the persons of Hillman and Ilco because each of them has substantial, continuous and systematic contacts with this judicial district.

14.     Venue in this judicial district is proper pursuant to 28 U.S.C. § 1391(b) because, among other reasons, a substantial part of the events giving rise to the claims occurred in this district and Hillman and Ilco may be found in this district for purposes of § 1391(b).

## TRADE AND COMMERCE

15.     This action involves Defendants' anticompetitive domination and control of the markets for replacement key blanks and automatic key duplication systems, as well as exclusionary conduct affecting the related markets for LNS and key accessories.  Defendants' actions, individually and in concert, have had the effect of stabilizing or artificially elevating prices and limiting choices for consumers of these products and have caused substantial harm to competition and to the business and property of the Company.  As a result of Hillman's and Ilco's unlawful conduct, every person who has purchased one or more of these products, which includes virtually every adult consumer in the U.S., has suffered harm.

### *The Market for Key Duplication Systems in Big Box Retail Stores.*

16.     The overwhelming majority of replacement keys are purchased by consumers from Big Box retailers and from independent hardware stores, including those associated with buying cooperatives like True Value Hardware, Ace Hardware and Do-It-Best Hardware ("Do-It-Best").  Replacement keys can also be purchased by consumers from professional locksmiths, but these sales account for only a small fraction of the total annual volume of replacement keys sold in the U.S.

17.     Key duplication services are offered in the hardware or automotive departments of all Big Box retail stores.  Because of employee turnover, lack of employee training, low

staffing levels and pressure for operational efficiencies, Big Box retailers in the U.S. do not use conventional key-cutting machines such as those in use in independent hardware stores.  They instead use specialized automatic key duplication machines, and each Big Box store generally has a single machine, always supplied by a single firm.  Axxess Technologies, Inc. ("Axxess Technologies") in Phoenix, Arizona was the first firm to enter the market with these automatic machines in the early 1990s.  Hillman bought Axxess Technologies in 2000 for $110 million in cash and notes.  The automatic key duplication machine developed by Axxess Technologies was offered under the Axxess® brand, and Hillman continued to market it under this brand after acquiring the company.  The Axxess machine is used by all Big Box retailers in the U.S. that offer key duplication services.  This type of machine will be referred to as an "automatic key machine."

18.     Because an automatic key machine uses the shape of a key to aid in the selection of the proper key blank and automatically cuts the blank to the correct shape, employee input needed for cutting a key is drastically reduced from that needed for manual cutting using a conventional key duplication machine.  Hillman states on its website that "making quality duplicate keys with the precision of a locksmith is as easy [with the Axxess machine] as sharpening a pencil."  According to Hillman, the Axxess machine "has reinvented the entire key duplication process by virtually eliminating all of the problems associated with having a key duplicated, allowing the operator to quickly identify, locate and accurately cut the key."  There are other types of key duplication machines commercially available for use in retail stores, but none of them is designed for high-volume applications, and none of them can both identify the key and then automatically cut the key blank to the correct dimensions.

19.    Prior to 2007, a Big Box retailer desiring to install an automatic key machine had no alternative but to utilize the Axxess machine, the only automatic key machine commercially available.  The unique demands of Big Box retailers in the U.S. for technological equipment that enables high-volume key duplication services without investment of resources in employee training and without time-consuming employee interaction with customers, coupled with the need for immediate on-site service by the manufacturer in the event of software or equipment failure, created formidable barriers to entry.  The high carrying costs needed to maintain a full range of replacement key blanks in the U.S. and the long lead times needed for an overseas supply chain pose additional barriers to any potential foreign entrant into the U.S. market, since Big Box retailers look for high inventory turns and just-in-time deliveries from the provider of the automatic key machine.  In the absence of any substitute products, Big Box retailers had no choice but to install the Axxess machine.  Referring to the Axxess machine, Hillman has stated in its Form 10-K that Hillman's status "as a national supplier of proprietary products to Big Box retailers allows it to develop a strong market position and high barriers to entry . . ." (emphasis added).

20.    Hillman promotes, markets and supplies the Axxess machine in interstate commerce.  Although key duplication machines are manufactured and sold outside of the U.S., foreign manufacturers have been unable to meet the unique demands of Big Box retailers in the U.S. described in ¶ 19 and have not succeeded in marketing their machines in the U.S. for use in Big Box retail stores.  Indeed, there are no machines manufactured outside of the U.S. which are suitable for use in Big Box stores or substitutable for the Axxess machine or the Company's machine in Big Box retail applications.

21.     After years of research and development and expenditure of more than $2.5 million, the Company introduced a competing automatic key machine in 2007, called the Key Identification + Duplication machine, or "KID."  The KID machine is the only feasible product substitute to the Axxess machine in the automatic key machine market; no other manufacturer in the U.S. or elsewhere has developed a commercially effective substitute for the Axxess machine.  The KID machine has performance characteristics superior to those of the Axxess machine.  The Company promotes, markets and supplies the KID machine in interstate commerce.  It is currently in use in some 250 Wal-Mart stores in which Wal-Mart had previously been using the Axxess machine, but Wal-Mart continues to use the Axxess machine in all of its more than 3200 other U.S. stores.  With the exception of Wal-Mart stores using the KID machine and a small number of Home Depot stores, Hillman has placed the Axxess machine in 100% of the Lowe's, Home Depot, Menard's, Orchard, Sears, Kmart, Meijer and other Big Box retail stores offering key duplication services, numbering over 14,900 Big Box retail locations.

22.     Hillman does not charge a retailer for an Axxess machine, but, upon information and belief, it requires that the retailer purchase all of its replacement keys exclusively from Hillman or sources approved by Hillman.  Hillman sets the price of key blanks to the retailer sufficiently high so revenue from the retailer's purchase of blanks more than offsets the cost of installing and maintaining the machine.  With the exception of approximately 60 Home Depot stores in New Jersey to which the Company began supplying replacement key blanks and tracing key duplication machines in 2001, Hillman controls the supply of all key blanks used for cutting replacement keys at every store with an Axxess machine.  Because Hillman provides the automatic key machines used in almost all U.S. Big Box retail stores, it has, thus, a monopoly on replacement key blanks purchased by Big Box retailers, and it states on its website that it is "the

number one supplier of keys to Mass Merchant, Home Center, and Supermarket channels of trade."

23.    Because Big Box retailers rely on the supplier of an automatic key machine also to supply the replacement key blanks to be cut on the machine and do not pay directly for the automatic key machine or independently source replacement key blanks, the supply of an automatic key machine and replacement key blanks to Big Box retailers constitutes a relevant product market.  It will be referred to as the market for "automatic key machine systems."  There are no key duplication systems readily substitutable for the automatic key machine system for Big Box retail applications, and there is no cross-elasticity of demand between the automatic key machine system and other key duplication systems for this application.  The barriers to entry described in ¶¶ 19-20 have effectively prevented foreign firms from competing for automatic key machine systems in Big Box retailers, and the geographic market for automatic key machine systems is the U.S.  Hillman has monopoly power in the U.S. market for automatic key machine systems, and it has exercised that power, as shown in this Complaint, to control prices in or exclude competition from the market.

### *The Market for Replacement Key Blanks.*

24.    According to Hillman, the annual market in the U.S. for key blanks totals approximately 600 million units at the retail level.  Blanks for replacement keys are made from brass or brass alloys.  Consumers do not purchase blanks directly but instead buy them from the store at which they have had a duplicate key made.  Other than Big Box retailers obtaining key blanks as part of their automatic key machine systems, the primary purchasers of key blanks are franchise and independent hardware stores as well as buying cooperatives that supply them, along with professional locksmiths.

25.     Hillman purchases key blanks from Ilco, and its supply agreement with Ilco ("Supply Agreement") requires it to purchase at least 100 million blanks annually.  Since the agreement began in 1998, Hillman has purchased more than the minimum each year.  Hillman purchases "licensed" keys from other vendors, and these are keys on which a famous trademark or logo is displayed.  It obtains, for example, keys with Disney® figures from Howard Keys and keys with National Football League team logos from Siskiyou Gifts.  Hillman sells replacement key blanks, including those purchased from Ilco, in interstate commerce.

26.     Ilco manufactures key blanks at a single plant in Rocky Mount, North Carolina, and, upon information and belief, all of the key blanks that it sells to Hillman come from this plant.  Ilco also sells key blanks to individual hardware store retailers, but it does not compete with Hillman in selling key blanks to Big Box retailers.  Ilco sells its replacement key blanks in interstate commerce, and it had, until 2003, supplied the Company with its requirements for key blanks, including key blanks that the Company began selling to Home Depot stores in New Jersey in 2001.  Ilco cut off the Company as a customer in 2003 after it successfully bid against Ilco for the national contract to supply key blanks to the Ace Hardware buying cooperative.  The Company was able to bid for the Ace key blank business after having first arranged to source key blanks from a manufacturer in Taiwan.  Ilco, which had previously supplied the Ace Hardware cooperative, lost sales totaling some 25 million key blanks annually.   The Company sells replacement key blanks in interstate commerce.

27.     Replacement key blanks constitute a relevant market.  There are no products readily substitutable for key blanks, and there is no cross-elasticity of demand between key blanks and other products.  A consumer needing to replace a key has no alternative but to buy a replacement key that will work in the lock for which the original key was cut.  Retailers seeking

to obtain replacement key blanks for sale to consumers have limited supply choices, and they must buy them from a supplier that can maintain adequate stocks and provide adequate service. There are no foreign suppliers able to satisfy these requirements for U.S. retailers.  As detailed in ¶¶ 36-39, barriers to entry are high, and the relevant geographic market for replacement key blanks available to Big Box retailers and hardware retailers and cooperatives supplying hardware retailers is the U.S.  As the sole source of replacement key blanks purchased by Hillman under the Supply Agreement and as a vendor of key blanks directly to individual hardware retailers and to hardware cooperatives (True Value, Do-It-Best and Handy Hardware), Ilco, upon information and belief, controls, directly and through Hillman, more than 80% of the U.S. market for replacement key blanks and has monopoly power in the market.  As a result of, and through the exercise of, this monopoly power, Ilco has been able to exclude competition from the market.

### *Hillman and Ilco Have Acquired Control of the Relevant Markets*

28.    Although the federal government attempted to prevent undue concentration of the key blank market in the late 1960s, Hillman and Ilco have since then steadily increased their respective control of that market as well as related markets.  In blocking a merger between Ilco and another key blank supplier, Cole National Corporation, the Federal Trade Commission recognized in 1967 in *Cole National Corp.*, 71 F.T.C. 1504 (1967), that the sale of key blanks and replacement keys to retailers is a relevant line of commerce for antitrust analysis.

29.    In the years following the *Cole National* case, Hillman emerged as a supplier of key blanks, key duplicating machines, fasteners and LNS, eventually acquiring the successor businesses of Cole National Corporation.  Over the same period, Ilco steadily gained market share in the market for key blanks, through both acquisitions and internal expansion.

30.     The market for replacement key blanks became increasingly concentrated in the late 1990s, when Hillman transferred its key manufacturing business to Ilco, through the sale of its Curtis Retail Division.   During the same period, Ilco acquired, among other key blank producers, Silca SpA, ALBA, and the key manufacturing assets of Axxess Technologies, becoming the dominant supplier of replacement key blanks in the U.S. by 2000.

31.     Beginning in the late 1990s, Hillman acquired, among other firms, Sign-Ko, Royalty America, PMI, Sharon Fasteners, Dorman Specialty Fasteners, Fast-n-It and Axxess Technologies, becoming the dominant supplier in the U.S. of fasteners and automatic key machines to Big Box retailers and a major supplier of LNS.

32.     Upon information and belief, concentration and elimination of competition in the markets for replacement key blanks and automatic key machines have been facilitated between Hillman and Ilco since at least 2001 by the interlocking directorate of Maurice P. Andrien, Jr. Andrien has concurrently served, and continues to serve, as a director of The Hillman Companies, Inc. ("Hillman Companies") and Kaba Holdings AG, the parent corporations of Hillman and Ilco, respectively.   Andrien was Chairman of Hillman Companies from 2001 to 2004.   Upon information and belief, additional coordination and personnel interrelationships have existed between Hillman and Ilco at the director and senior management levels since the 1990s.

33.     In summary, prior to the *Cole National* decision, eight firms supplied 82% of the replacement key blanks in the U.S. and three firms supplied 95% of the key duplicating machines in the U.S.   As a result of continuous and increasing consolidation over the succeeding years, two firms -- Hillman and Ilco -- now control the replacement key market.   Upon information and belief, Hillman and Ilco have a combined share exceeding 80% of the market for

the sale of replacement key blanks in the U.S., and, as shown in ¶¶ 19-23, Hillman has nearly complete control of the market for automatic key machine systems.

### *The Company's Vulnerable Position As A New Entrant In The Automatic Key Machine Systems Market*

34.     The Company has limited financial resources, and it was able to enter the automatic key machine systems market largely through borrowing.  Revenue from sales was not adequate to fund the investment in research and development, increased manufacturing capacity and expanded staffing for manufacturing operations and field supervision of new machine installations needed for entry.  Without continued access to borrowing and capital, the Company will be unable to grow its base of installed machines, adequately serve its customers, increase manufacturing output or continue product innovation through research and development.

35.     As a direct result of the exclusionary conduct of Hillman and Ilco described in this Complaint, the Company's ability to fund further development of the KID machine and enhancement of its manufacturing capacity has been constrained, as has its ability to fund other investment needed to increase penetration in the market for automatic key machine systems.  Its ability to access sources of capital and private equity needed to increase market penetration has been similarly impaired.

### *Barriers to Entry into the Relevant Markets Are High.*

36.     Because the supplier of an automatic key machine to a Big Box retailer typically provides the machine on loan in return for supplying the key blanks cut on the machine, a potential competitor seeking to enter the market for automatic key machine systems must not only have the ability to offer a state-of-the-art automatic key machine but must also have access to sufficient capital for the heavy upfront investment needed to manufacture and place in a

critical mass of stores fully operational automatic key machines, not to mention unimpaired access to a reliable source of supply for the full range of replacement key blanks.   The proprietary and patent-protected technology underlying automatic key machines poses, additionally, a formidable barrier for any potential entrant.

37.     A firm cannot enter the U.S. market for the supply of replacement key blanks without the ability to continuously stock and service retailers or, in the case of hardware cooperatives like True Value and Ace, to stock and service the warehouses that supply the retailers.  To establish the capability to produce key blanks for the U.S. market, a firm would need to be able to manufacture or source continuously approximately 500 different styles of key blanks (although only two or three main styles account for the majority of key blank sales).  In addition, many replacement key blank retailers also purchase key accessories, fasteners and LNS from their key blank supplier, and a firm seeking to enter the market without at least one or more of these additional product lines will be at a significant competitive disadvantage.

38.     The current competitors in the market for replacement key blanks have surmounted these entry barriers by various means.  Each has access to a source of supply of a full range of replacement key blanks.  Ilco makes its own keys; Hillman buys its keys from Ilco under a long-term supply contract, the Supply Agreement; and the Company has managed to establish reliable off-shore sourcing for keys.  Each has long-established access to the retail hardware store market.  Ilco has sold both key duplication machines and replacement key blanks into the market.  Hillman has sold key duplication machines, key blanks, and other product lines, like fasteners and LNS, into the market.  The Company has sold LNS and key blanks into the market, and it began manufacturing and selling a key duplication machine to hardware stores even before it developed the KID machine for Big Box retailers.

39.     The foregoing barriers to entry into the replacement key blank market -- *i.e.,* the need for a secure and reliable key blank source and the ability to reliably stock and service hardware retailers and provide related product lines -- have effectively limited the key blank supply options for retailers to these three firms, and Hillman has further entrenched its position and prevented new entrants in the replacement key blank market by implementing the exclusive dealing arrangements, described in ¶ 22, at the more than 14,900 Big Box store locations with an Axxess machine.  Hillman described in its 2002 Form 10-K the competitive advantages it has in this market, and the description remains accurate:

> *Hillman believes that it maintains the leading market share of keys in terms of unit and dollar sales.*  To displace Hillman's market position, a competitor would have to develop a full range of products with demonstrably better technology without infringing on patents.  These competitors would also have to buy back existing inventory from retailers.  Management believes that *these substantial competitive barriers help to preserve its unique franchise within the key duplication market segment.*

(Emphasis added.)

## HILLMAN'S EXCLUSIONARY CONDUCT

### *The Company Is Forced out of Orchard.*

40.     Orchard is an 80-store home center chain headquartered in California owned or controlled by Sears Holdings Corporation.  Hillman has had its Axxess machine in most, if not all, of Orchard's stores since before 2005, and it was, prior to 2005, the sole supplier of replacement key blanks to Orchard.  All of the keys cut on Axxess machines in Orchard stores came from Hillman.

41.     The Company offered in 2005 to sell to Orchard licensed keys displaying Looney Tunes® cartoon characters and the Superman® logo.  Hillman was already offering some licensed keys at Orchard stores, and the Company's keys would have given consumers a wider

selection of trademarked and logoed keys to consider in buying replacement keys. When Hillman learned that Orchard had decided to source replacement keys from the Company, its representatives claimed that doing so would breach Orchard's supply contract with Hillman, and they insisted that Orchard cancel the orders it had placed with the Company. Orchard determined that the claim of breach was false, and it began buying licensed keys from the Company in late 2005.

42.     Facing the loss of its monopoly in the supply of replacement key blanks to the Orchard chain, Hillman representatives next urged Orchard to terminate the Company as a supplier on the ground that the Company's key blanks could damage the Axxess machines. They told Orchard's buyer in 2006 that the Company's keys were inferior in quality and that the cutting tools on the Axxess machine could be damaged as a result. The Company demonstrated to Orchard that Hillman's claim was spurious and defamatory, pointing to the fact, among others, that, in more than eight months of supplying key blanks, Orchard had reported no problems to the Company.

43.     Orchard continued buying licensed key blanks from the Company. Apparently dissatisfied with the performance of Axxess machines and for other reasons, Orchard's buyer initiated in June 2007 a review for the key product line, notifying Hillman that it would have to submit a bid for the right to continue to supply key blanks in the future. The Company was also invited to bid for the key business, and it proposed to install its new KID machine to handle Orchard's key duplication needs. Since the KID machine had just recently been introduced commercially, the Company proposed to install a limited number of KID machines in Orchard stores on a test basis.

44. Hillman's lawyers sent a cease and desist letter to the Company on November 9, 2007 asserting that the cutting mechanism on the KID machine infringed a Hillman patent, No. 7,114,894, ("'894 Infringement Letter"). Aware of the Company's intention to install the KID machine if it were successful in securing the key business at Orchard, Hillman representatives discussed the '894 Infringement Letter in detail with Orchard's buyer within days of November 9 and long before the Company could even respond to it. Hillman did so, upon information and belief, in an effort to influence the buyer's decision-making and dissuade him from moving Orchard's key business to the Company. The letter was just the latest in Hillman's attempts to exclude the Company from supplying replacement keys to Orchard.

45. Even after Hillman representatives had discussed the cease and desist letter with Orchard, Orchard assured the Company in November 2007 that it would run tests on the KID machine at two stores prior to making a decision on awarding the key supply contract.

46. Notwithstanding Orchard's concerns over the performance of the Axxess machines, notwithstanding the pending line review for keys, well before any KID machine could be installed for testing, and without any evaluation of the KID machine, either for performance or in connection with Hillman's infringement claim -- Orchard notified the Company in December 2007 that it would keep the key business with Hillman, ending the Company's efforts to enter the market for automatic key machine systems by supplying keys to Orchard. Upon information and belief, Orchard terminated the key line review prior to testing the Company's machine in direct response to threats and coercion by Hillman carried out through the exercise of its monopoly power in the market for automatic key machine systems. Upon information and belief, Hillman promised Orchard, in return for termination of the line review, that it would introduce in the Orchard stores a new generation of automatic key machine, the P4, at an early

date to replace the Axxess machine and that it would give Orchard meaningful economic concessions.

47.     Within a matter of months after termination of the key line review, Orchard had also terminated, as Hillman had been urging, its supply arrangement with the Company for licensed keys, restoring Hillman's complete monopoly in the supply of replacement key blanks to Orchard.  Contrary to its promise to replace the Axxess machine with the P4, Hillman has made no significant upgrades in the Axxess machine at any Orchard stores.

48.     The foregoing conduct of Hillman had no efficiency justification and was intended to block the Company from expanding its customer base in the market for automatic key machine systems.  Hillman intended to exclude, and its conduct had the effect of excluding, competition from the market for automatic key machine systems and market for replacement key blanks and to maintain its monopoly by excluding its only competitor in the market for automatic key machine systems.  The conduct reflects a pattern and practice of deliberately false statements calculated to disparage and defame the Company's products or coerce compliance by Orchard with Hillman's exclusionary agenda.  There was no basis for disclosure of the infringement letter and discussion of its contents with Orchard -- in advance of any lawsuit having been filed and long before the Company could have even begun a test run of the KID machine in Orchard stores -- other than  to discredit the Company and threaten Orchard with reprisals if it were to award key business to the Company.

### *The Company's Expansion in Wal-Mart Stores Is Blocked.*

49.     Beginning in 2005, the Company began development of an automatic key machine, and it did so with specific attention to the key duplication needs of Wal-Mart.  The Company understood that Wal-Mart believed that the key duplication provided by the Axxess

machine could be improved with new technology and that it was looking for an alternative to the Axxess machine that would both embody newer technology and reduce the frequency of miscut keys.

50.     By 2006, Wal-Mart had approved installation of the Company's new machine in test stores in Florida, and the first KID machines were installed and operational by mid-2007. Each Wal-Mart store has only one or two automatic key machines, and Wal-Mart removed one or more Axxess machines to make way for the KID machine in each store.  Wal-Mart informed the Company that, going forward, it would be following a strategy of having two suppliers for its key duplication business -- the Company and Hillman -- and, in reliance upon this commitment from Wal-Mart, the Company invested resources in the manufacture and support of additional machines and in research and development for technological improvements to the machines.

51.     The KID machine performed as promised, and it had been installed in 100 Wal-Mart stores by year-end 2008.  The Company had, in the meantime, continued its development work, and it began installing an improved model, the KZA-200, in additional stores in 2009.  By the fourth quarter of 2009, Wal-Mart had added the KID machine to 150 more stores as it continued to implement its two-supplier strategy.  For every store gained by the Company, Hillman lost a store.

52.     In discussions with Wal-Mart about how to pay for the KID machine, the Company proposed selling each machine at a fixed price and then charging separately for key blanks.  No agreement could be reached on this approach, and the Company does not charge Wal-Mart for machines.  The only payments made by Wal-Mart are for key blanks purchased from the Company, and the Company prices replacement key blanks at a level that will permit it

to offset the cost of machines.  Wal-Mart purchases replacement key blanks from the Company on a continuing basis and maintains inventory sufficient to satisfy store needs.

53.     With limited financial resources and limited access to capital, the Company has concentrated its efforts to enter the automatic key machine systems market on achieving commercial success for the KID machine in Wal-Mart stores.  It estimates that it will need to place machines in approximately 1500 stores before it will have recovered its sunk costs in research and development, and Wal-Mart's two-supplier strategy promised to permit the Company to realize a return on its investment in the 2012 timeframe.

54.     Hillman has engaged in a pattern and practice of exclusionary conduct in order to block penetration by the Company into the Wal-Mart account and, by extension, into the relevant market.  Wal-Mart is Hillman's third-largest customer, and it contributed 8% of Hillman's total revenue of $458 million in 2009, or $36.6 million.  When Hillman discovered in 2007 that Wal-Mart had begun replacing the Axxess machine with the KID machine in Florida stores, Hillman launched a program to inspect, examine and photograph KID machines in Wal-Mart stores, using subterfuge and deception.  In at least one instance, a Hillman representative posed as a Company employee to gain access to the KID machine;  in others, Hillman employees posed as consumers seeking to purchase keys cut by the KID machine.  Hillman backed off only in response to warnings from Wal-Mart.

55.     Just as it had done with Orchard, Hillman informed Wal-Mart in November 2007 of the '894 Infringement Letter.  It notified Wal-Mart of the letter before the Company could even respond to it and before Hillman had filed any infringement action.  Upon information and belief, it did so for the sole purpose of discrediting the Company and threatening Wal-Mart with

reprisals, implicitly or explicitly, if it were to continue to replace Axxess machines with KID machines.

56.     Hillman sued the Company in December 2007 alleging infringement of the '894 patent, and it filed on April 30, 2009 an amended pleading alleging infringement of a second patent, No. 6,064,747, relating to a key identification method.  Apparently frustrated that the '894 Infringement Letter had not slowed Wal-Mart's introduction of the KID machine, Hillman directed its counsel to send Wal-Mart a letter outlining its claims against the Company and explaining why Wal-Mart should reconsider its plans to add KID machines.  Hillman's letter, sent in May 2009, purported to inform Wal-Mart about the '747 infringement claim ("'747 Infringement Letter").  It spelled out the need for Wal-Mart to abandon the plans, and it threatened disruption of its business if it failed to do so.  The letter was calculated to force Wal-Mart to reexamine its two-supplier strategy, and Hillman necessarily intended the letter to be acted upon by Wal-Mart.

57.     Upon information and belief, Hillman knew at the time the '747 Infringement Letter was sent that the '747 infringement claim was groundless, and, by August 27, 2009, Hillman had moved to dismiss it.  Not surprisingly, Hillman sent no corrective letter to Wal-Mart notifying it of its decision to seek dismissal.  Since Hillman's purpose in sending the letter -- to discredit the Company and remind Wal-Mart of potential reprisals if it were to fail to drop the KID machine -- had already been achieved, there was no reason for Hillman to communicate further with Wal-Mart on the subject.

58.     Despite Hillman's December 2007 infringement action against the Company, Wal-Mart continued working with the Company to increase the number of stores with KID

machines.  By early 2009, it had committed to place machines in 150 more stores, for a total of 250 stores.

59.     In an effort to shift inventory costs to its vendors, Wal-Mart began discussing with the Company in early 2009 a pay-for-scan system under which Wal-Mart would not pay the Company for a key blank until it had been scanned and cut for a customer.  The system, if implemented, would effectively shift to the Company the cost of maintaining store-level key blank inventories, and the Company estimated that it could save Wal-Mart approximately $1250 per store annually.  Wal-Mart concurrently began discussing with Hillman converting to pay-for-scan in stores with Axxess machines.   No Big Box retailers use a pay-for-scan system for replacement keys, and conversion to this system by Wal-Mart would have been a dramatic shift in the manner by which replacement keys are sourced and sold.  Not only would the vendor need to bear the cost of in-store inventory, but also floor planning would need to provide for the automatic key machine to be positioned in close proximity to a register.  Because of Wal-Mart's internal procedures and approval processes, conversion within a single store could take many months or even years to complete.  For other retail departments, such as greeting cards, that have been converted by Wal-Mart to pay-for-scan, full conversion has taken approximately three years.

60.     The Company understood Wal-Mart's desire to convert to pay-for-scan, and it worked with Wal-Mart's buyer to develop the optimum approach to a pay-for-scan system for replacement key blanks, at all times cognizant of Wal-Mart's two-supplier strategy and the expectation that the KID machine would continue to be added to stores as the two-supplier strategy were implemented.   Upon information and belief, Hillman resisted the pay-for-scan

system because it would shift inventory costs and otherwise disrupt Hillman's established business model for dealing with Wal-Mart.

61.     Unsuccessful in blocking Wal-Mart's introduction of the KID machine at the outset in 2007, unsuccessful in slowing Wal-Mart's replacement of Axxess machines with KID machines even after sending the '894 Infringement Letter in November 2007 and initiating litigation in December 2007, and unsuccessful in slowing Wal-Mart's two-supplier strategy with the '747 Infringement Letter in May 2009 --  Hillman in early 2010 shifted attention to the pay-for-scan program in an effort to arrest the Company's progress with Wal-Mart.

62.     Even though Hillman had avoided the pay-for-scan system and, upon information and belief, declined to commit to Wal-Mart for it, Hillman abruptly changed its position.  The about-face coincides with the Company's commitment to convert to the pay-for-scan system, and Wal-Mart notified the Company in February 2010 that Hillman would convert to pay-for-scan in all stores with Axxess machines.  Wal-Mart notified the Company at the same time that no further stores would be added to the 250 in which the KID machine was already operational, halting any further expansion and stalling the two-supplier strategy.  Wal-Mart also informed the Company that Hillman would make, upon information and belief, a one-time payment of up to $5 million to buy back key blanks inventory from the more than 3200 stores with Axxess machines.  Under the buy-back, Wal-Mart would not ship key blanks back to Hillman; it would simply enter up to $5 million on its balance sheet.  As inventory is worked down in each store under the pay-for-scan system, Wal-Mart will pay Hillman for a replacement key blank only after one has been cut and payment received from the customer.

63.     Hillman's sudden acceptance of pay-for-scan -- after years of indifference and only after learning that the Company had committed to it -- in combination with its offer,

accepted by Wal-Mart, to pay Wal-Mart up to $5 million to buy back store inventory, was intended to and has had the effect of excluding the Company from access to any additional Wal-Mart stores.  Upon information and belief, Hillman agreed to participate in pay-for-scan only on condition that Wal-Mart terminate conversion of additional stores to the KID machine, and Wal-Mart determined to halt replacement of Axxess machines with KID machines and delay its two-supplier strategy in direct response to Hillman's threats, coercion and inducements.  There is no legitimate efficiency justification for Hillman offering to repurchase store inventory, just as there was no efficiency justification for any of Hillman's earlier efforts to exclude the Company from Wal-Mart.  Rather than compete on the merits, which would have exposed the failings and shortcomings of the Axxess machine in relation to the KID machine, Hillman has engaged in a campaign of exclusionary conduct designed to eliminate the Company from Wal-Mart and restore Hillman's former absolute monopoly.  By means of the foregoing exclusionary conduct, Hillman has succeeded in blocking any further penetration by the Company into Wal-Mart stores and arresting any further risk of erosion of Hillman's monopoly in the automatic key machine systems market.

64.     Hillman carried out the foregoing exclusionary conduct for the purpose of protecting its monopoly in the market for automatic key machine systems, and it would have made no economic sense for Hillman to commit to a $5 million payment but for the exclusionary impact of the payment on the Company, thereby allowing Hillman to maintain or extend its monopoly power in the market and locking in Wal-Mart for the duration of the conversion period to continued use of the Axxess machine at each of the some 3200 stores currently using it.

### _Hillman Has Used Its Monopoly Power in the Market for Automatic Key Machine Systems to Stifle and Forestall Innovation in Automatic Key Machines._

65.     Axxess Technologies first developed its automatic key machine technology in the early 1990s and gained significant market share at the expense of its main rival, VISTA 2000 ("Vista"), a company that had acquired American Consumer Products, Inc. ("ACPI"), the successor to Cole National.  Cole National had been the long-standing leader in the manufacturer of manual key cutting machines.

66.     In order to compete against the Axxess machine, Vista and its affiliates developed new key cutting machines embodying technology superior to that of the Axxess machine.

67.     Axxess Technologies sued ACPI for patent infringement in 1995.  The litigation was settled in 1996, and in 1997 Axxess Technologies purchased ACPI.  Axxess Technologies thereupon discarded the new ACPI key-cutting technologies and took them off the market.

68.     By 2001, Hillman, as a result of its purchase of Axxess Technologies in 2000, had secured 100% of the market for automatic key cutting technology in the U.S..

69.     The patent application for the '747 patent, which had originally been prosecuted by Vista, was filed in 1997, and the patent was issued to Axxess Technologies in 2000.  Upon information and belief, Axxess Technologies and Hillman have never used the technology claimed in this patent in any of their commercially available key cutting machines.  Instead, upon information and belief, the '747 patent has only been used by Hillman in an attempt to block competitors from developing their own technology, as shown in ¶¶ 56-57.

70.     Hillman filed its application for the '894 patent in 2002, and the patent was issued in 2006.  Hillman's automatic "cartridge" machine does not embody the claims of the '894 patent.  It is the "P4" machine that utilizes this patent.  Already possessing monopoly power in the market for automatic key machine systems, Hillman, upon information and belief, has

devoted comparatively little effort to the development and testing of the P4 machine and has had little or no incentive to bring the P4 machine to market.

71.     Introduction of the KID machine in 2007 cast in sharp relief the technological and performance shortcomings of Hillman's automatic cartridge machine, as well as the poor performance to date of Hillman's still largely experimental P4 machine.  Without immediate investment of significant resources in research and development to achieve improvements in its existing machine, Hillman was threatened with the loss of its monopoly in the market for automatic key machine systems from Big Box retailers switching to the superior KID machine.  Not only would Hillman need to invest significantly in research and development, but it would also need to commit sufficient capital to be able to replace, at a cost of tens of millions of dollars and without any prospect of immediate off-setting monopoly profits, the nearly 15,000 Axxess machines in Big Box stores with new and upgraded machines.

72.     Rather than incur the potentially enormous costs of attempting to respond on the merits to the superior performance of the KID machine, Hillman determined, upon information and belief, to use its monopoly power to insulate from competition its aging and technologically obsolete installed base of machines in the Big Box retailer market.  It has done so by the exclusionary conduct detailed above at Orchard and Wal-Mart, and it has engaged in other exclusionary conduct, either alone or in combination with Ilco, for achievement of this specific goal as more fully described in this Complaint.  Upon information and belief, its sole objective has been to maintain its monopoly and thereby stifle and block innovation in automatic key machines that would otherwise be available to Big Box retailers for the benefit of consumer welfare.

### *Hillman Has Used Bundled Rebates and Other Predatory Conduct to Exclude the Company from Accounts in the Franchise and Independent Retailer Hardware Market.*

73.     Hillman sells fasteners to hardware retailers, and, according to its Form 10-K, fasteners are the "core" of its business, accounting for more than half of its total revenue of $458 million in 2009, or $253 million.  Fasteners are screws, nuts, bolts, washers, and similar hardware items, and Hillman describes itself on its website as "the leader in today's fastener market." Hillman sells fasteners to both Big Box retailers, which it calls "national accounts" in its Form 10-K, and to franchise and independent retail outlets, which it calls "F & I" accounts or customers.  Individual retailers in the F & I segment of the hardware retail market, which will be referred to as the "F & I market," are typically members of the large buying cooperatives, such as True Value, Ace and Do-It-Best.

74.     An F & I retailer that is a member of a buying cooperative may purchase hardware items either from the cooperative or from another source.  The cooperative does not require a member retailer to purchase goods from it, and the cooperative, thus, competes against other vendors for the retailer's business.

75.     Fasteners sold by Hillman include standard and specialty nuts, bolts, washers, screws, anchors and picture hanging items, and they are sold in the what is known as the "hardware aisle" in retail stores.  Upon information and belief, Hillman has a dominant position in the Big Box fastener market, and it is the primary, if not the sole, supplier of fasteners to Lowe's and other Big Box retailers in the U.S.  Lowe's is Hillman's largest customer, accounting for 23.7% of its total revenue in 2009.

76.     Hillman also supplies fasteners to the F & I market, and it is the primary, if not sole, supplier of fasteners to the Ace, True Value and other buying cooperatives.  Hillman has actively prevented buying cooperatives from developing other sources of fasteners and

entrenched its position as the dominant supplier of fasteners to this market by, among other conduct, acquiring the retail fastener business of Fastenal Company in 2002 when Fastenal, working in conjunction with the Company, was in the process of developing a supply relationship with the Ace cooperative. In addition to selling fasteners to cooperatives for their warehouses, Hillman sells fasteners to individual hardware retailers, and it states in its Form 10-K that it services approximately 14,000 retail outlets in the F & I market. It does so using sales personnel who call on individual stores and manage fastener inventory for the store owner or manager.

77.     Hillman also sells LNS to the Big Box retailer and F & I markets. LNS accounted for 7.5% of Hillman's total revenue in 2009, or $34 million, and, upon information and belief, Hillman is the primary, if not sole, supplier of LNS to Home Depot, Lowe's, Orchard and other Big Box retailers, as well as to Handy Hardware and other buying cooperatives in the F & I market.

78.     In addition to selling replacement key blanks to Big Box retailers, as described in ¶ 22, Hillman sells replacement key blanks to the F & I market. It sells key blanks primarily to individual retailers, including those that are members of the Ace, True Value and Do-It-Best cooperatives, but it has also recently competed to supply key blanks to the True Value and Do-It-Best cooperative warehouses. Retailers in the F & I market do not use automatic key machines. They cut keys on comparatively unsophisticated tracer machines which store employees have been trained to operate.

79.     Hillman also sells what are called "key accessories" to the Big Box and F & I markets. This line of products includes key chains, tags, lights and holders, and Hillman is the primary, if not sole, supplier of key accessories to Home Depot, Lowe's, Orchard, Kmart and

other Big Box retailers.  It is the primary, if not sole, supplier of key accessories to Handy Hardware, and it sells key accessories to individual retailers, including those that are members of the Ace, True Value and Do-It-Best cooperatives.

80.     The Company sells LNS to the Big Box retailer and F & I markets, and it has been in the business of making and selling LNS for approximately 60 years.  This is the Company's largest product line, and it contributes more than 60% of the Company's total annual revenue.  It is the most profitable of the Company's product lines, contributing approximately 50% of the Company's annual gross profits, and the Company depends upon revenue from the sale of LNS to fund its overall operations, subsidize its research and development for the automatic key machine and offset much of the cost associated with introducing the KID machine to the marketplace.  The Company is the primary, if not sole, supplier of LNS to Wal-Mart, Kmart, Meijer, Target and other Big Box retailers.  It is the primary, if not sole, supplier of LNS to the Ace, True Value and Do-It-Best cooperatives and to Orgill, Inc., a wholesale supplier to retail hardware stores.  It does not sell directly to individual retailers in the F & I market because it sells to the cooperative warehouses that supply the retailers.

81.     The Company also sells key accessories.  It has been a supplier of key accessories to Wal-Mart for years, and it has been supplying key accessories to Home Depot's New Jersey stores in combination with its sale of replacement key blanks to those stores.  Apart from these two chains, the Company has no key accessory customers in the Big Box retailer market.  The Company supplies key accessories to cooperatives in the F & I market, and it is the primary, if not sole, supplier of key accessories to the Ace and True Value cooperatives and to Orgill.  It does not sell directly to individual retailers in the F & I market, because it sells to the cooperative warehouses.

82. The Company and Hillman are direct competitors for the sale of LNS to the Big Box retailer and F & I markets, and Hillman identifies the Company in its Form 10-K as its major competitor in LNS products for its F & I business.  Prior to 2007, the Company's LNS business had grown consistently by adding new accounts and increasing volume at existing accounts.  While it faced competition from Hillman for new accounts, it had not, to the best of the Company's knowledge, lost an existing account to Hillman.

83. Starting in 2007, after the Company had introduced the KID machine in the first Wal-Mart stores, Hillman changed its competitive strategy for the LNS market and began targeting the Company's existing accounts.  In 2007, Hillman took the Company's LNS business away from a 40-store retail chain in the Detroit area, ACO Hardware ("ACO"), by offering significant economic concessions on fasteners in return for ACO switching its LNS business from the Company to Hillman.  The Company, which had been supplying LNS to ACO since 1995, lost approximately $125,000 in annual sales.

84. Hillman bid against the Company for the LNS business of Menard's, a 240-store Big Box home center headquartered in Eau Claire, Wisconsin, in 2007.  Then, as now, Hillman provided all of the key duplication services at Menard's and had an Axxess machine in each of its stores.  Menard's put the LNS product line up for review in 2007, expressing an interest in a new merchandising approach.  The Company, which had been supplying all of Menard's LNS business for 7 years, developed an entirely new racking and display system, proposing to roll it out in all of the stores over a six-to-nine month schedule and offering to buy back any obsolete racking, product and other items.  The Company proposed to invest more than $500,000 in the upgrade.  It lost the business to Hillman, which blatantly copied the Company's design for a new racking and display system with a system whose features were identical to those proposed by the

Company.  Upon information and belief, Hillman priced the LNS business to Menard's below its total near-term conversion costs in order to force the loss of the business by the Company.  The Company lost $2 million in annual sales, representing almost 5% of annual revenue.

85.     The Company had supplied the 80-store Orchard chain with all of its LNS needs for 15 years, with annual sales of approximately $500,000.  Following Orchard's abrupt reversal of its commitment to test the KID machine, described at ¶¶ 46-48, Orchard put the LNS business up for a line review in 2009.  The only bidder other than the Company was Hillman.  Despite the Company quoting prices for the business lower than those which it had previously been offering, Hillman was given the LNS line.   Upon information and belief, Hillman was successful in bidding for the LNS business because it subsidized a deep discount on the LNS business through the other lines it was then selling, and continues to sell, to Orchard -- replacement key blanks, key accessories and fasteners.   By bundling discounts on key accessories, fasteners and replacement key blanks, Hillman effectively forced the Company out of the LNS business at Orchard.  Even though the Company is equally as efficient as, or more efficient than, Hillman, it was unable to respond to discounting by Hillman on fasteners, since it was impossible for the Company to compensate for lost discounts on products that it does not offer.  The Company could offer no response to discounting on key blanks, since, as stated in ¶ 47, Orchard had previously given all of its key blank business to Hillman.

86.     The Company had been the primary, if not sole, supplier of LNS to Handy Hardware, a hardware cooperative based in Houston, for some 40 years, and it had annual LNS sales of approximately $250,000.  The Company learned in July 2009 that Hillman had offered to supply Handy Hardware with all its needs for LNS at a price below that at which the Company was supplying LNS and to do so on the condition that Handy Hardware also source its fasteners

and key accessories from Hillman.  Since the Company does not offer fasteners, it was unable to respond to Hillman's bundled discount offer, and it lost the LNS business in August 2009.  Upon information and belief, Hillman conditioned a low price for the LNS business upon agreement by Handy Hardware that it would also purchase fasteners and key accessories from Hillman. Although Hillman had previously been supplying fasteners, LNS, keys and key accessories to individual retail stores belonging to the Handy Hardware cooperative, it was able, upon information and belief, to take over the LNS and fastener business at the cooperative level by offering aggressive bundled rebates and discounts which the Company was unable to match because it does not offer the fastener line.

87.    Hillman's targeting of the Company's profitable LNS business is part and parcel of a strategy to force the Company out of the automatic key machine system market by simultaneously driving up its costs of doing business -- by forcing it to devote time and resources to respond to competitive challenges in other lines of its business -- and curtailing its access to revenue needed to fund expansion in the automatic key machine system market -- by bundling discounts and rebates and engaging in predatory pricing to take long-standing customers away from the Company.  Even though the Company is equally as efficient as, or more efficient than, Hillman, it was impossible for the Company to compensate for discounts given by Hillman on the fastener line, which the Company does not offer.  Hillman carried out this exclusionary conduct in furtherance of its overarching unlawful goal of barring the Company from achieving the efficiencies and economies of scale needed to compete effectively in the relevant market and thereby drive down prices, create product choices for consumers and increase output.  Hillman's actions do not make economic sense but for their exclusionary impact on the Company.

### *Hillman Has Coerced Suppliers of Licensed Keys to Refuse to Sell to the Company.*

88.    The Company offers for sale replacement key blanks displaying Looney Tunes®
cartoon characters, the Superman® logo and other licensed marks, and it does so pursuant to
arrangements with owners of the licensing rights for the marks.  Keys bearing famous marks and
logos are a lucrative and growing segment of the market for replacement keys.  Hillman offers
licensed replacement key blanks and states in its Form 10-K that it offers keys "featuring NFL,
MLB, Disney, Harley Davidson and other licensed properties," noting that it has taken keys and
key accessories "from a price sensitive commodity to a fashion driven business and has
significantly increased retail pricing and gross margins."

89.    The Company has negotiated with the owners of the licensing rights for Disney®
marks and NFL team logos, Howard Keys and Siskiyou Gifts ("Siskiyou"), respectively, to
secure the right to use the marks and logos on replacement keys.  Upon information and belief,
Howard Keys and Siskiyou are free, under their license agreements with the owners of the
trademark rights, to license any vendor of replacement keys to use the marks, and they have
licensed Hillman.  When the Company discussed in 2007 with a representative of Siskiyou
obtaining the right to sell keys with NFL team logos, Siskiyou notified Hillman, and Hillman
objected to any rights being granted to the Company.  Upon information and belief, Hillman
threatened Siskiyou with reprisals if it were to license the Company, and, in response to pressure
from Hillman, Siskiyou discontinued discussions and declined to supply keys to the Company.
Such reprisals were credible and forced Siskiyou to terminate discussions with the Company
only because of Hillman's monopoly power, with Ilco, in the market for replacement keys.

90.    The Company was approached by Howard Keys in late 2009 to acquire a license
to use Disney® marks on replacement keys.  After the parties had begun discussing commercial

terms, Howard Keys informed Hillman that it would be licensing the Company.  Just as it had done when it learned of Siskiyou's intention to license the Company for NFL team logos, Hillman let Howard Keys know that it should not license the Company for Disney marks and, upon information and belief, threatened reprisals if it were to do so.  Howard Keys acquiesced and broke off discussions with the Company, thereby demonstrating, again, how Hillman has exploited its monopoly power to exclude competitors from the market.

91.    As a direct result of Hillman's intervention in the foregoing negotiations, the Company has been blocked from access to and the ability to sell lucrative licensed replacement keys bearing Disney or NFL marks.

### HILLMAN HAS UNLAWFULLY EXERCISED ITS MONOPOLY POWER TO EXCLUDE THE COMPANY FROM THE MARKET FOR AUTOMATIC KEY MACHINE SYSTEMS.

92.    Aware of the limited financial resources of the Company and its status as a new entrant in the market for automatic key machine systems, Hillman has exercised its monopoly power by means of the exclusionary conduct detailed in ¶¶ 40-91 with the specific intent (a) to drive up the Company's costs of doing business and thereby impair its ability to borrow or secure capital needed for product development, expansion of manufacturing capacity and employment of additional staff needed for expanded manufacturing, sales and marketing operations, (b) to reduce revenue to the Company by taking business away from it at major accounts or coercing suppliers to refuse to deal with the Company, (c) to raise doubts about its ability to function as a reliable supplier of goods and services competitive with Hillman, (d) to prevent it from achieving economies of scale necessary for sustained and credible performance in the market and (e) otherwise to block it from gaining a secure foothold in the market.

93.     Hillman has engaged in conduct intended to drive up the Company's costs of doing business, and having as its effect increasing the costs of doing business, by, among other things, (a) suing it for infringement of the '894 and '747 patents, thereby necessitating that the Company incur legal fees and expenses in defending against the claims and divert valuable management time, attention and resources to defense of the litigation, (b) filing the '894 infringement action in a venue, the District of Arizona, which it necessarily knew was improper and in which it necessarily knew there was no personal jurisdiction over the Company, thereby requiring the Company to incur substantial legal and other expenses to obtain dismissal of the action, and (c) taking steps to initiate product line reviews at major accounts, thereby forcing the Company to devote management time, attention and other resources to respond to the line reviews.

94.     Hillman has engaged in conduct intended to reduce revenue, and having as its effect reduction of revenue, to the Company by, among things, targeting the Company's LNS line at major accounts in the F & I market, including Menard's, ACO, Orchard and Handy, and doing so, upon information and belief, by means of bundled rebates and other anticompetitive pricing that exploits Hillman's power in the fastener market to predatorily price LNS products in competition with the Company.  Without a fastener line, the Company has been unable to respond to Hillman's anticompetitive pricing and has thereby lost LNS business and accompanying sales revenue at multiple accounts.

95.     Hillman has engaged in conduct intended to raise doubts about the Company's ability to function as a reliable supplier of goods and services in competition with Hillman by, among other things, (a) falsely stating to Orchard that the Company's replacement key blanks would damage the Axxess machine if Orchard were to attempt to cut them on the machine, (b)

disclosing to Orchard and Wal-Mart the '894 Infringement Letter or its contents for the purpose of disparaging the Company and its products and (c) urging Wal-Mart to cease using the Company as a supplier because of Hillman's claim of infringement of the '747 patent, which Hillman necessarily knew at the time was groundless.

96.     Hillman has engaged in conduct intended to prevent the Company from achieving the economies of scale needed for sustained and credible performance in the market by, among other things, (a) draining off its assets by forcing it to devote significant financial and legal resources and management time and effort to defend against patent infringement claims, thereby curtailing its ability to borrow or raise capital for business development, (b) choking off its sources of sales revenue by aggressively targeting accounts at which the Company has long supplied LNS and, by means of bundled rebates and other predatory actions, taking the business away from the Company, and (c) spreading false and defamatory representations about the Company and its products in an effort to damage its reputation in the marketplace.

97.     The foregoing conduct was achieved through the exercise by Hillman of its monopoly power in the relevant market, and it was intended, and had as its effect, preservation of Hillman's monopoly by exclusion of the only viable competitor from meaningful entry into the market for automatic key machine systems.  As a direct and proximate result of the conduct, the Company has suffered harm to its business and property from foreclosed market opportunities, increased costs of doing business, lost profits and otherwise in an amount yet to be determined but reasonably believed to exceed millions of dollars.

## HILLMAN AND ILCO HAVE COMBINED AND CONSPIRED TO EXCLUDE THE COMPANY FROM THE RELEVANT MARKETS.

98.     In order to protect their respective monopolies in the relevant markets, Ilco and Hillman have combined and conspired to exclude the Company from the markets and unlawfully and unreasonably restrain trade in the markets.

### *Exclusion of the Company from Supplying Replacement Key Blanks to the True Value Cooperative.*

99.     The Company has since 2003 supplied the Ace cooperative with all of its replacement key blank needs, some 25 million keys annually.  Ace in turn sells the key blanks to its member retail stores to be cut as replacement keys for store customers.  The Company won the business from Ilco in 2003 by offering Ace superior quality, service and innovation, including key blanks with UPC coding (bar codes) to permit greatly streamlined inventory management for both Ace and its member retail stores.  As noted in ¶ 74, a retail store is under no obligation to buy its replacement keys from Ace, and Hillman competes against Ace in supplying replacement key blanks to individual retail stores.  For every key sold by Hillman to a retailer, the Ace cooperative warehouse sells one less key.

100.    Hillman and Ilco compete against the Company for the sale of replacement keys to the F & I market.  Other than Jet Hardware Manufacturing ("Jet"), based in Brooklyn, New York, there are no other viable suppliers of replacement key blanks to the F & I market, and Jet primarily sells to the locksmith trade, not the F & I market.  The major cooperatives in the F & I market -- Ace, True Value, Do-It-Best and Handy -- buy all of their replacement key blank needs from a single vendor, and it is either Ilco (True Value, Do-It-Best, Handy) or the Company (Ace).

101.    Hardware cooperatives view Hillman, Ilco and the Company as competing suppliers for replacement key blanks, and True Value invited Hillman, Ilco and the Company to bid for its replacement key line in late 2008.  Ilco was at the time the primary supplier of key blanks to True Value, although the Company had been supplying True Value with a small volume of a few types of licensed keys.  Apparently unknown to True Value, Ilco was the sole supplier of replacement key blanks to Hillman, and Hillman would have sourced keys from Ilco if it had underbid Ilco and won the business.  Upon information and belief, Ilco and Hillman combined and conspired in arriving at a coordinated strategy for the line review for the purpose of ensuring that the Company would lose the review and not take business away from Ilco.  Ilco had the lowest bid for the warehouse business, and True Value retained it as its supplier of replacement key blanks.

102.    Hillman competes against the True Value cooperative for the sale of replacement keys to individual retailers, and, just as with Hillman's sale of keys to Ace retail stores, the sale of key to a True Value retail store takes a sale away from the True Value cooperative.  Since Ilco supplies Hillman with all of its keys, Ilco is not impacted by the loss of sales through the True Value cooperative.  Either way, Ilco sells a key.

103.    The foregoing bid rigging by Hillman and Ilco in responding to the True Value line review had no competitive justification, was the functional equivalent of a boycott -- blocking the Company from a successful bid to supply replacement key blanks to the True Value cooperative -- and was intended to, and had as its effect, elimination of competition for a major account in the replacement key blank market, totaling tens of millions of key blanks annually, thereby unreasonably restraining trade in the market.  Lacking any conceivable procompetitive or efficiency justification, the Hillman-Ilco group boycott was a naked restraint of trade.  Upon

information and belief, Hillman and Ilco combined and conspired to ensure that no matter how low Ilco bid in order to win the line review for the cooperative business, Hillman would make up any losses by sharing profits or otherwise reimbursing it through the sale of Ilco keys to True Value stores at retail.  The more keys sold by Hillman to True Value retail stores, the fewer Ilco keys the stores could be expected to buy from the True Value cooperative and the fewer sales by Ilco to the cooperative at the price it had to bid to keep the business away from the Company. Even if it were agreed between Hillman and Ilco that Hillman would cut its prices on key blanks to retailers in order to reduce their purchases from the cooperative, Hillman would have been able to make up any losses through adjusting prices on its other product lines sold to a given retailer, *e.g.*, fasteners, LNS and key accessories.  Such actions by Hillman and Ilco are only rational because of their exclusionary impact on the Company, their primary rival in the replacement key market.

104.    Hillman and Ilco had the motive to conspire to exclude the Company from supplying replacement key blanks to the True Value cooperative.  They had the motive to conspire for this exclusionary purpose because the Company threatened Ilco's grip on the True Value replacement key business and the ability of Ilco and Hillman jointly to continue to control the supply and pricing of replacement keys to the F & I market, both at the cooperative warehouse level and at the individual store level.  The Company had already made a serious inroad into this market by gaining the Ace cooperative warehouse key business in 2003.

105.    Hillman and Ilco had the opportunity, means and ability to conspire to exclude the Company from supplying True Value.  Through the Supply Agreement, Hillman and Ilco had necessarily long been in continuous dialogue and coordination on the supply of replacement key blanks to the U.S. market, pursuing their joint interests under the Supply Agreement to ensure

that Hillman would meet the 100 million-units-per-year purchase requirement and that Ilco would supply Hillman's needs for replacement keys.  By allocating markets and customers to maximize the volume of Ilco-sourced keys sold by Hillman and Ilco in the U.S. market, as described in ¶¶ 106-10, Hillman and Ilco have, thus, collaborated to exclude any competitive threats to Ilco's domination, directly and through Hillman, of the U.S. market for replacement key blanks.  Through the interlocking directorate of Andrien, Hillman and Ilco have had the means and ability to coordinate their response to competitive threats and to ensure that neither acts in a manner inconsistent or in conflict with the interests of the other in carrying out their shared goal of excluding competition from the market.

### *Market Allocation by Hillman and Ilco in Furtherance of Exclusion of the Company from the Relevant Markets*

106.   In order to protect Hillman's monopoly in the automatic key machine system market, maximize the volume of replacement key blanks purchased by Hillman under the Supply Agreement and preserve Ilco's monopoly position in the U.S. market for replacement key blanks, Ilco and Hillman have agreed, upon information and belief, that Ilco will refrain from selling or seeking to sell replacement keys to Big Box retailers as long as Hillman is providing the retailers with automatic key machine systems.  They have thus unlawfully allocated between themselves this segment of the replacement key market to Hillman, with Ilco agreeing not to compete for the business of Big Box retailers.  Ilco has the capability, means and resources to compete against Hillman in the supply of replacement key blanks to Big Box retailers but has instead combined and conspired with Hillman not to compete against it in this market.

107.   Hillman and Ilco have likewise, upon information and belief, combined and conspired to allocate customers and accounts in the F & I market and have done so for the unlawful purpose of maintaining Ilco's monopoly in the supply of replacement key blanks to the

U.S. market. Without such an agreement, Hillman's purchase of keys from Ilco under the Supply Agreement would be undercut by Ilco competing against Hillman for the business of individual hardware retailers now supplied by Hillman. In furtherance of this unlawful allocation of customers and accounts in the F & I market, Ilco has, upon information and belief, directed its sales representative for the retail hardware store market, Creeden & Associates ("Creeden"), not to solicit retailers that are Hillman accounts.

108.    In order to protect Hillman's access to individual retail stores for the ostensible purpose of providing inventory management, Ilco has, upon information and belief, agreed with Hillman not to bar-code key blanks sold by Ilco to the hardware cooperatives, including True Value, and it has, likewise, agreed with Hillman not to bar-code any keys sold by it to Hillman under the Supply Agreement. Although the Company has shown that bar-coding is technologically feasible -- and the Company bar-codes millions of key blanks that it sells annually to the Ace cooperative warehouse -- as long as keys originating from Ilco have no bar-coding, management of key inventory at the individual store level remains needlessly difficult and complicated, thereby providing Hillman with a pretext for what is essentially category management of the key blank inventory at individual stores and aiding Hillman in protecting Ilco's replacement key monopoly in the F & I market.

109.    The foregoing unlawful allocation of markets and customers has unreasonably restrained trade in the market for automatic key machine systems by directly contributing to the maintenance and entrenchment of Hillman's monopoly. It has unreasonably restrained trade in the market for replacement key blanks by eliminating price competition and consumer choices, thereby contributing directly to maintenance and entrenchment of Ilco's monopoly. The purpose of the combination and conspiracy to allocate markets and customers is purely exclusionary, and

there is no efficiency or other pro-competitive justification.  Hillman and Ilco had the motive, opportunity, means and ability to conspire for this purpose as shown in ¶¶ 104-05.

110.    The foregoing unlawful conspiracy to exclude the Company from supplying replacement key blanks to True Value and to allocate markets and customers was devised and implemented for the specific purpose of excluding competition from the relevant markets and, by unlawfully facilitating maintenance of Hillman's and Ilco's respective monopolies, has materially contributed to blocking the Company's and other competitors' access to the markets. As a direct and proximate result of this unlawful conspiracy, the Company has suffered harm to its business and property from foreclosed market opportunities, increased costs of doing business, lost profits and otherwise in an amount yet to be determined but reasonably believed to exceed millions of dollars.

## ILCO HAS UNLAWFULLY EXERCISED ITS MONOPOLY POWER TO EXCLUDE THE COMPANY FROM THE MARKET FOR REPLACEMENT KEY BLANKS.

111.    As described in ¶ 26, until 2003, the Company had purchased its replacement key blank requirements from Ilco.  Ilco cut off the Company as a customer in 2003 after it successfully bid against Ilco for the national contract to supply key blanks to the Ace Hardware buying cooperative.  Upon information and belief, Ilco's abrupt decision no longer to supply the Company was intended to punish it for competing with Ilco and force it out of the market for the supply of replacement key blanks.

112.    In addition to cutting off the Company's supply of replacement key blanks, Ilco at the same time initiated a chain of anticompetitive actions intended to eliminate the Company as a competitor.  Ilco representatives spread false and defamatory rumors in the industry that the Company's keys contained unsafe levels of lead and arsenic and that they were difficult to cut due to the brittleness of their metal and other factors.

113.     When the Company attempted to obtain a license from UPI Marketing to sell keys with sports logos and other famous marks on them, Ilco, upon information and belief, coerced UPI Marketing to refuse to license the Company, thereby blocking the Company from access to a source of lucrative and popular replacement key blanks.

114.     As the supplier of replacement key blanks to the New Jersey Home Depot stores, the Company was looked to by store personnel for repair of key-cutting machines, and the Company had replaced Axxess machines with Ilco key duplicating machines in 2001.  These were less sophisticated key-cutting tracer machines, and, prior to Ilco's termination of the Company as a customer for key blanks, Ilco had cooperated fully with the Company in arranging to supply repair parts for the machines.  Following termination, Ilco refused to cooperate further, and the Company was forced to engage the support of independent professional locksmiths to replace cutting blades and other parts and perform other service on the Ilco machines.  When Ilco learned that the Company had circumvented its refusal to cooperate in supporting repair of the machines, it applied economic pressure to coerce the independent locksmiths to boycott the Company, thereby eliminating any access by the Company to third-party assistance in the support and repair of Ilco's own machines.

115.     In a further effort to drive the Company out of the market for replacement key blanks, Ilco hired in 2003 a sales representative, Creeden, to begin soliciting business for Ilco in retail stores in the F & I market -- a market it had never previously sought to penetrate directly, having relied instead in the past upon Hillman reselling its keys to hardware retailers or upon Ilco's own sales of key blanks to hardware cooperative warehouses, such as True Value and Ace. Upon information and belief, Ilco instructed Creeden to solicit sales from Ace Hardware retailers for the purpose of reducing their purchase of replacement key blanks from the Ace cooperative --

keys supplied by the Company after it won the business from Ilco.  Every sale of an Ilco key blank made by Creeden to an Ace retail store was one less sale of a Company key blank by the Ace cooperative.

116.    In furtherance of its plan to drive the Company out of the market, Ilco successfully combined and conspired with Hillman, as described in ¶¶ 99-105, to exclude the Company from supplying replacement key blanks to the True Value cooperative.

117.    The foregoing anticompetitive conduct of Ilco has been continuous and part of a pattern and practice of conduct intended to exclude, and which has had the effect of excluding, the Company from a significant portion of the market for replacement key blanks.  There is no efficiency justification for the conduct, and Ilco has pursued it solely for the purpose of protecting its monopoly in the market for replacement key blanks.  Ilco has carried out the foregoing continuing conduct with the specific intent (a) to deprive the Company of a reliable source of key blanks, (b) to reduce revenue to the Company by taking business away from it at major accounts, (c) to raise doubts about its ability to function as a reliable supplier of key blanks competitive with Ilco, (d) to drive up the Company's costs of doing business in competition with Ilco and (e) otherwise to block the Company from gaining a secure foothold in the market.  Ilco was able to achieve its anticompetitive goals only through the exercise of its monopoly power in the relevant market, and its conduct was intended for, and had as its effect, preservation of Ilco's monopoly by exclusion of the only viable competitor from meaningful entry into the market for replacement key blanks in the U.S.  As a direct and proximate result of Ilco's unlawful conduct, the Company has suffered injury to its business and property from foreclosed market opportunities, increased costs of doing business, lost profits and otherwise in an amount yet to be determined but reasonably believed to exceed millions of dollars.

## INJURY TO COMPETITION

118.    As a result of Hillman's exclusionary conduct undertaken for maintenance of its monopoly power in the market for automatic key machine systems, trade in the market has been unreasonably restrained and the public has been denied the benefits of free and open competition.  By exercising its monopoly power to exclude competition, Hillman has (a) restrained price competition in the market, artificially maintaining the price of replacement keys to consumers, (b) restricted output, blocking consumer access to alternative suppliers of replacement key blanks, and (c) stifled innovation, depriving consumers of the benefits that competing technologies could be expected to produce in a free and open market, leading to better products, more choices and lower prices.

119.    As a result of Ilco's exclusionary conduct undertaken for maintenance of its monopoly power in the market for replacement key blanks, trade in the market has been unreasonably restrained and the public has been denied the benefits of free and open competition.  By exercising its monopoly power to exclude competition, Ilco has (a) restrained price competition in the market, leading to artificially elevated prices for replacement keys sold to consumers, and (b) restricted output, blocking consumer access to alternative suppliers of replacement key blanks.

120.    Hillman's and Ilco's joint and collaborative conduct has unreasonably restrained trade in the markets for automatic key machine systems and for replacement key blanks by (a) eliminating price competition, thereby artificially elevating replacement key prices for consumers, (b) restricting output, thereby limiting product choices and alternatives for consumers, (c) allocating markets and customers in furtherance of elimination of competition

between Hillman and Ilco and (d) maintaining and entrenching Hillman's and Ilco's monopolies in the respective markets.

## COUNT I:  MONOPOLIZATION BY HILLMAN OF THE MARKET FOR AUTOMATIC KEY MACHINE SYSTEMS IN VIOLATION OF SECTION 2 OF THE SHERMAN ACT

121.    The Company hereby adopts and incorporates by reference as if fully rewritten herein  the allegations in ¶¶ 1-120 of the Complaint.

122.    Hillman's activities, as described herein, occurred within the flow of, and substantially affected, interstate commerce.

123.    During the period of time relevant to this Complaint, Hillman supplied automatic key machine systems to Big Box retailers throughout the U.S.

124.    During the period of time relevant to this Complaint, Hillman has had monopoly power in the market for automatic key machine systems in the U.S.

125.    Hillman has exercised its monopoly power in the market to engage in a pattern of prolonged and sustained exclusionary and anticompetitive conduct, through the willful, unlawful and anticompetitive means described in this Complaint, designed for the purpose, and with the specific intent, of maintaining its monopoly in the market, excluding the Company and deterring potential competitors from the market for automatic key machine systems in the U.S.

126.    The foregoing exercise of monopoly power by Hillman has no legitimate business or efficiency justification and has been undertaken solely for the exclusion of competition, actual and potential, from the market.   Hillman's conduct constitutes unlawful monopolization in violation of Section 2 of the Sherman Act (15 U.S.C. § 2).

127.    As a direct and proximate result of Hillman's conduct in violation of Section 2, the Company has suffered and will continue to suffer injury to its business and property and

irreparable harm for which it has no adequate remedy at law.  The Company's injury flows directly from Hillman's conduct in violation of Section 2 and not from the exercise by Hillman of any lawful right.

128.    As a direct and proximate result of Hillman's conduct in violation of Section 2, open and fair competition in the market for automatic key machine systems has been unreasonably restrained, leading to diminished retailer and consumer choice, output reduction, impaired innovation, and artificially elevated prices.

129.    But for Hillman's anticompetitive conduct in violation of Section 2, the Company would by now have established a presence in the market for automatic key machine systems sufficient to provide consumers with meaningful product choices and reduced prices as a result of vigorous interbrand competition.

## COUNT II:  ATTEMPTED MONOPOLIZATION BY HILLMAN OF THE MARKET FOR AUTOMATIC KEY MACHINE SYSTEMS IN VIOLATION OF SECTION 2 OF THE SHERMAN ACT

130.    The Company hereby adopts and incorporates by reference as it fully rewritten herein the allegations in ¶¶ 1-120 and ¶¶ 122-29 of the Complaint.

131.    Hillman's activities, as described herein, occurred within the flow of, and substantially affected, interstate commerce.

132.    Even if Hillman does not have monopoly power in the market for automatic key machine systems, it has a specific intention to monopolize the market, and, because of its market share, anticompetitive conduct, significant barriers to entry and other factors, there is a dangerous probability that it will succeed in monopolizing the market.

133.    The exclusionary conduct of Hillman described in this Complaint has no legitimate business or efficiency justification and was undertaken solely for exclusion of

competition, actual and potential, and with the specific intent to achieve monopolization of the market.  The foregoing conduct, in combination with Hillman's specific intent to monopolize the market and the dangerous probability that it will succeed in monopolizing the market, constitutes a violation of Section 2 of the Sherman Act.

134.    As a direct and proximate result of Hillman's conduct in violation of Section 2, the Company has suffered and will continue to suffer injury to its business and property and irreparable harm for which it has no adequate remedy at law.  The Company's injury flows directly from Hillman's conduct in violation of Section 2 and not from the exercise by Hillman of any lawful right.

135.    As a direct and proximate result of Hillman's conduct in violation of Section 2, open and fair competition in the market for automatic key machine systems has been unreasonably restrained and is threatened with unlawful monopolization, leading to diminished retailer and consumer choice, output reduction, impaired innovation, and artificially elevated prices.

136.    But for Hillman's anticompetitive conduct in violation of Section 2, the Company would by now have established a presence in the market for automatic key machine systems sufficient to provide consumers with meaningful product choices and reduced prices as a result of vigorous interbrand competition.

## COUNT III:  MONOPOLIZATION BY ILCO OF THE MARKET FOR REPLACEMENT KEY BLANKS IN VIOLATION OF SECTION 2 OF THE SHERMAN ACT

137.    The Company hereby adopts and incorporates by reference as if fully rewritten herein the allegations in ¶¶ 1-120, 122-29 and 131-36 of the Complaint.

138.    Ilco's activities, as described herein, occurred within the flow of, and substantially affected, interstate commerce.

139.    During the period of time relevant to this Complaint, Ilco supplied replacement key blanks for sale in the U.S.

140.    During the period of time relevant to this Complaint, Ilco has had monopoly power in the market for replacement key blanks in the U.S.

141.    Ilco has exercised its monopoly power in the market to engage in a pattern of prolonged and sustained exclusionary and anticompetitive conduct, through the willful, unlawful and anticompetitive means described in this Complaint, designed for the purpose, and with the specific intent, of maintaining its monopoly in the market and excluding the Company and deterring potential competitors from the market for replacement key blanks in the U. S.

142.    The foregoing exercise of monopoly power by Ilco has no legitimate or efficiency justification and has been undertaken solely for the exclusion of competition, actual and potential, from the market.  Ilco's conduct constitutes unlawful monopolization in violation of Section 2 of the Sherman Act.

143.    As a direct and proximate result of Ilco's conduct in violation of Section 2, the Company has suffered and will continue to suffer injury to its business and property and irreparable harm for which it has no adequate remedy at law.  The Company's injury flows directly from Ilco's conduct in violation of Section 2 and not from the exercise by Ilco of any lawful right.

144.    As a direct and proximate result of Ilco's conduct in violation of Section 2, open and fair competition in the market for replacement key blanks has been unreasonably restrained,

leading to diminished retailer and consumer choice, output reduction, impaired innovation and artificially elevated prices.

145.     But for Ilco's anticompetitive conduct in violation of Section 2, the Company would by now have established a presence in the market for replacement key blanks sufficient to provide consumers with meaningful product choices and reduced prices as a result of vigorous interbrand competition.

<u>COUNT IV:  ATTEMPTED MONOPOLIZATION BY ILCO OF THE MARKET FOR REPLACEMENT KEY BLANKS IN VIOLATION OF SECTION 2 OF THE SHERMAN ACT</u>

146.     The Company hereby adopts and incorporates by reference as if fully rewritten herein the allegations in ¶¶ 1-120, 122-29, 131-36 and 138-45 of the Complaint.

147.     Ilco's activities, as described herein, occurred within the flow of, and substantially affected, interstate commerce.

148.     Even if Ilco does not have monopoly power in the market for replacement key blanks, it has a specific intent to monopolize the market, and, because of its market share, anticompetitive conduct, significant barriers to entry and other factors, there is a dangerous probability that it will succeed in monopolizing the market.

149.     The exclusionary conduct of Ilco described in the Complaint has no legitimate business or efficiency justification and was undertaken solely for exclusion of competition, actual and potential, and with the specific intent to achieve monopolization of the market.  The foregoing conduct, in combination with Ilco's specific intent to monopolize the market and the dangerous probability that it will succeed in monopolizing the market, constitutes a violation of Section 2 of the Sherman Act.

150.    As a direct and proximate result of Ilco's conduct in violation of Section 2, the Company has suffered and will continue to suffer injury to its business and property and irreparable harm for which it has no adequate remedy at law.  The Company's injury flows directly from Ilco's conduct in violation of Section 2 and not from the exercise by Ilco of any lawful right.

151.    As a direct and proximate result of Ilco's conduct in violation of Section 2, open and fair competition in the market for replacement key blanks has been unreasonably restrained and threatened with unlawful monopolization, leading to diminished retailer and customer choice, output reduction, impaired innovation and artificially elevated prices.

152.    But for Ilco's anticompetitive conduct in violation of Section 2, the Company would by now have established a presence in the market for replacement key blanks sufficient to provide consumers with meaningful product choices and reduced prices as a result of vigorous interbrand competition.

### COUNT V:  CONSPIRACY BY AND BETWEEN HILLMAN AND ILCO TO MONOPOLIZE THE RELEVANT MARKETS IN VIOLATION OF SECTION 2 OF THE SHERMAN ACT

153.    The Company hereby adopts and incorporates by reference as if fully rewritten herein the allegations in ¶¶ 1-120, 122-29, 131-36, 138-45 and 147-52 of the Complaint.

154.    Defendants' activities, as described herein, were within the flow of, and substantially affected, interstate commerce.

155.    Hillman and Ilco have combined and conspired to monopolize the markets for automatic key machine systems and replacement key blanks in the U.S. and to exclude competition from the markets, including the Company.

11525558.5

156.    The joint and collaborative conduct of Hillman and Ilco described herein was undertaken in furtherance of a conspiracy to monopolize, was specifically intended to monopolize the markets for automatic key machine systems and for replacement key blanks in the U.S. and has unreasonably restrained trade in the markets in violation of Section 2 of the Sherman Act.

157.    As a direct and proximate result of this conspiracy to monopolize, the Company has suffered and will continue to suffer injury to its business and property and irreparable harm for which it has no adequate remedy at law.  The Company's injury flows directly from the conduct of Hillman and Ilco in violation of Section 2 and not from the exercise by Hillman or Ilco of any lawful right.

158.    As a direct and proximate result of Defendants' conduct in violation of Section 2, open and fair competition in the relevant markets has been unreasonably restrained or is threatened with unreasonable restraint, leading to diminished retailer and customer choice, reduced innovation and artificially elevated prices.

159.    But for Defendants' conspiracy to monopolize the markets in violation of Section 2, the Company would by now have established a presence in the markets for automatic key machine systems and for replacement key blanks sufficient to provide consumers with meaningful product choices and reduced prices as a result of vigorous interbrand competition.

## COUNT VI:  COMBINATION AND CONSPIRACY BY HILLMAN AND ILCO IN RESTRAINT OF TRADE IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT

160.    The Company hereby adopts and incorporates by reference as if fully rewritten herein the allegations in ¶¶ 1-120, 122-29, 131-36, 138-45, 147-52 and 154-59 of the Complaint.

161.    Defendants' activities, as described herein, were within the flow of, and substantially affected, interstate commerce.

162.    Hillman has market power in the market for automatic key machine systems, and Ilco has market power in the market for replacement key blanks, and each has the ability to restrict prices, curtail output or exclude competition in its respective market as a result of its market power.

163.    Hillman and Ilco have combined and conspired to restrain trade in the markets for automatic key machine systems and for replacement key blanks, through bid rigging, market allocation and other concerted action, and have succeeded in unreasonably restraining trade in the markets.   There is no efficiency or other procompetitive justification for the joint and collusive action of Hillman and Ilco, and it constitutes a violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

164.    As a direct and proximate result of Defendants' unlawful conspiracy and combination in violation of Section 1, the Company has suffered and will continue to suffer injury to its business and property and irreparable harm for which it has no adequate remedy at law.   The Company's injury flows directly from conduct of Hillman and Ilco in violation of Section 1 and not from the exercise by Hillman or Ilco of any lawful right.

165.    As a direct and proximate result of Defendants' unlawful conspiracy and combination in violation of Section 1, open and fair competition in the relevant markets has been unreasonably restrained, leading to diminished retailer and customer choice, reduced innovation and artificially elevated prices.

166.    But for the Defendants' unlawful conduct in violation of Section 1, the Company would by now have established a presence in the markets for automatic key machine systems and for replacement key blanks sufficient to provide consumers with meaningful product choices and reduced prices as a result of vigorous interbrand competition.

## COUNT VII:  COMBINATION AND CONSPIRACY BY HILLMAN AND ILCO IN RESTRAINT OF TRADE IN VIOLATION OF THE VALENTINE ACT

167.    The Company hereby adopts and incorporates by reference as if fully rewritten herein the allegations in ¶¶ 1-120, 122-29, 131-36, 138-45, 147-52, 154-59 and 161-66 of the Complaint.

168.    The joint and collusive actions of Hillman and Ilco described herein constitute a conspiracy in restraint of trade in violation of the Valentine Act, Ohio Revised Code §§ 1331.01 *et seq*., and in particular Ohio Revised Code §1331.04.

169.    As a direct and proximate result the Defendants' conspiracy in violation of the Valentine Act, the Company has suffered and will continue to suffer antitrust injury to its business and property and irreparable harm for which it has no adequate remedy at law.

170.    As a direct and proximate result of Defendants' conspiracy in violation of the Valentine Act, open and fair competition in the relevant markets has been unreasonably restrained, leading to diminished retailer and customer choice, reduced innovation and artificially elevated prices.

171.    But for Defendants' unlawful conduct in violation of the Valentine Act, the Company would by now have established a presence in the markets for automatic key machine systems and for replacement key blanks sufficient to provide consumers with meaningful product choices and reduced prices as a result of vigorous interbrand competition.

WHEREFORE, the Company prays that judgment be entered for it on the Complaint against Hillman and Ilco, jointly and severally, and that the Court:

1.    Award the Company its damages incurred as a result of the anticompetitive and unlawful conduct alleged in this Complaint, in an amount to be proven at trial and thereafter trebled pursuant to 15 U.S.C. § 15 and Section 1331.08 of the Ohio Revised Code;

11525558.5                                                54

2.     Enter preliminary and permanent injunctive relief sufficient to prevent irreparable harm to the Company from the conduct of Hillman and Ilco, individually and in combination;

3.     Award to the Company its costs of suit, including reasonable attorneys' fees;

4.     Award to the Company all applicable prejudgment interest; and

5.     Award to the Company all other relief, legal and equitable, to which it may be entitled and as the Court deems just and proper.


Steven S. Kaufman (0016662)
Thomas J. Collin (0023770)
Robert F. Ware (0055515)
Matthew E. Liebson (0071544)

By :  __/s/ Thomas J. Collin_____
THOMPSON HINE LLP
3900 Key Center, 127 Public Square
Cleveland, OH 44114-1291
(216) 566-5500 (phone)
(216) 566-5800 (fax)

*Attorneys for Hy-Ko Products, Inc.*

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.


Steven S. Kaufman (0016662)
Thomas J. Collin (0023770)
Robert F. Ware (0055515)
Matthew E. Liebson (0071544)

By :  __/s/ Thomas J. Collin_____
THOMPSON HINE LLP
3900 Key Center, 127 Public Square
Cleveland, OH 44114-1291
(216) 566-5500 (phone)
(216) 566-5800 (fax)

*Attorneys for Hy-Ko Products, Inc.*